```
                DISTRICT COURT OF THE VIRGIN ISLANDS
                 DIVISION OF ST. THOMAS AND ST. JOHN

UNITED STATES OF AMERICA,       )
                                )
          Plaintiff,            )
                                )
     v.                         )    Civil No. 2016-18
                                )
FIVE HUNDRED AND FORTY DOLLARS  )
($540) IN U.S. CURRENCY,        )
REPRESENTING 540 PUERTO RICAN   )
LOTTERY TICKETS,                )
                                )
          Defendant.            )
                                )
```

**ATTORNEYS:**

**Gretchen Shappert, United States Attorney**
**Joycelyn Hewlett, AUSA**
**Sansara Cannon, AUSA**
United States Attorney's Office
St. Thomas, VI
   *For the United States of America.*


## MEMORANDUM OPINION[1]

**GÓMEZ, J.**

Before the Court is the motion of the United States for default judgment.

### I.  FACTUAL AND PROCEDURAL HISTORY

On October 13, 2015, United States Customs and Border Protection ("CBP") agents identified an Express Mail parcel in St. Thomas that was being shipped from Francisca Ruan ("Ruan")

---

[1] The Court previously ruled on the motion for default judgment. This memorandum opinion outlines the reasons for the Court's ruling.

in the United States Virgin Islands to Jeanninne Silvia ("Silvia") in Puerto Rico. The agents concluded that further investigation was warranted. Rather than seek a warrant to search the package, the CBP agents, in a decision made among themselves, chose to open and search the package.[2]

---

[2] The agents appear to have proceeded in this manner because they assumed that the creation of a separate customs zone in a United States territory for economic purposes creates a border that permits agents to execute warrantless searches of mail that crosses that border regardless of whether the mail is being sent from one United States citizen in a United States jurisdiction to another United States citizen in another United States jurisdiction. *See Declaration of Luis Velez*, ECF No. 1, at ¶ 4. ("CBP Officers exercising their border search authority opened the parcel . . . ."). Furthermore, it appears that CBP opens and searches both United States mail that is inbound to the Virgin Islands and United States mail that is outbound from the Virgin Islands. *See March 12, 2018, Hearing*, ECF No. 16, at 9:21-11:5 ("THE COURT: You're saying this is from mail coming into the Virgin Islands. THE WITNESS: Inbound or outbound, sir.").

    It is unclear whether that approach was informed by existing caselaw. *See, e.g., United States v. Hyde*, 37 F.3d 116, 121 (3d Cir. 1994) (holding that the Fourth Amendment permits "an individual leaving the Virgin Islands for one of the fifty states . . . [to] be subjected to a routine customs search[] prior to departure in the absence of any degree of suspicion that the individual is engaged in wrongdoing" because Congress has, by statute, placed the Virgin Islands in a separate customs territory). Significantly, the Third Circuit has not addressed whether there is any vigor in the Constitution's Fourth Amendment protections and the expectations of privacy that United States citizens in the Virgin Islands have in their private United States Postal Service mail, as against a geographically specific agency practice, regulation, or statute.

    It is also worth noting that even if the privacy interests of United States citizens in the Virgin Islands do not outweigh the Government's interest in permitting warrantless searches, there may be statutory limits on CBP's authority to search mail. Ordinarily, sealed mail sent through the United States Postal Service may only be searched without a warrant when the mail crosses a border if the mail weighs more than sixteen ounces and there is "reasonable cause to suspect" that the mail contains contraband or monetary instruments. *See* 19 U.S.C. § 1583. Mail sent from a United States location to a United States location is not subject to warrantless search. *See id.* No court has expressly addressed the extent to which 19 U.S.C. § 1583 applies to mail sent from the Virgin Islands to the 50 states or Puerto Rico or to the Virgin Islands from the 50 states or Puerto Rico.

    In any event, as the Court resolves this matter on other grounds, it need not reach these issues.

The parcel contained 540 Puerto Rican lottery tickets, which the agents seized as contraband. CBP then transported the lottery tickets to Puerto Rico and redeemed the winning tickets for $540.

On February 19, 2016, the United States filed a verified complaint in this Court seeking *in rem* forfeiture of $540 in U.S. currency, representing the winnings that were redeemed from the 540 seized Puerto Rican lottery tickets. On March 29, 2016, the United States sent written notices of civil forfeiture to Ruan and Silvia. No claims were filed in this forfeiture action.

On August 24, 2017, the United States filed a motion for default judgment. The Court addressed that motion at a hearing held on March 13, 2018, and March 14, 2018.[3]

## II.  DISCUSSION

Federal Rule of Civil Procedure 55(b)(2) allows courts to enter a default judgment against a properly served defendant who fails to file a timely responsive pleading. *Anchorage Assoc. v. V.I. Bd. Of Tax Rev.*, 922 F.2d 168, 177 n.9 (3d Cir. 1990). In considering a motion for default judgment, the factual allegations in the complaint are treated as conceded by the defendant, except those relating to the amount of

---

[3] At that hearing, the parties addressed the issues raised in this motion with regard to this case and other related cases.

damages. *DIRECTV, Inc. v. Pepe*, 431 F.3d 162, 165 (3d Cir. 2005); *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990). Default judgment is only appropriate where a plaintiff's well-pleaded facts, taken as true, demonstrate that the plaintiff is entitled to relief. *See, e.g., City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 n. 23 (2d Cir. 2011) ("Most of our sister circuits appear to have held expressly that a district court may not enter a default Judgment unless the plaintiff's complaint states a valid facial claim for relief."). "But while a defaulted defendant is deemed to 'admit the plaintiff's well-pleaded allegations of fact,' he 'is not held to admit facts that are not well-pleaded or to admit conclusions of law.'" *Cotton v. Massachusetts Mut. Life Ins. Co.*, 402 F.3d 1267, 1278 (11th Cir. 2005) (alteration omitted) (quoting *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975))

Even where a plaintiff is entitled to default judgment, the plaintiff is still "required to prove the amount of damages that should be awarded." *Oberstar v. F.D.I.C.*, 987 F.2d 494, 505 (8th Cir. 1993). Instead of relying on the allegations in the complaint, the Court must conduct an inquiry to ascertain the amount of damages. *See* Fed. R. Civ. P. 55(b) ("The court may conduct hearings . . . when, to enter or effectuate judgment, it

needs to . . . determine the amount of damages . . . ."); *see also United States v. Di Mucci*, 879 F.2d 1488, 1497 (7th Cir. 1989) (explaining that a default judgment may be entered without an evidentiary hearing on damages so long as the amount of damages is "capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits"); *Adolph Coors Co. v. Movement Against Racism and the Klan*, 777 F.2d 1538, 1544 (11th Cir. 1985) ("Damages may be awarded [in a default judgment] only if the record adequately reflects the basis for award via a hearing or a demonstration by detailed affidavits establishing the necessary facts." (internal quotation omitted)).

A motion for entry of default judgment must also contain evidence of the following: (1) that all pleadings were validly served upon the defendant; (2) that the defendant has not appeared; (3) that default was entered; (4) that the defendant is not an infant or incompetent; (5) an affidavit of non-military service; and (6) the amount of judgment and how it was calculated. *See Bank of Nova Scotia v. Abdallah*, No. CV 20012-0033, 2014 WL 2976232, at *3 (D.V.I. July 1, 2014). In addition, the Court must consider three factors when determining whether to grant a default judgment: "(1) [the] prejudice to the plaintiff if default is denied, (2) whether the defendant

appears to have a litigable defense, and (3) whether defendant's delay is due to culpable conduct." *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir. 2000).

### III.   ANALYSIS

The United States seeks forfeiture pursuant to 19 U.S.C. § 1305(a) ("Section 1305"). Section 1305 provides that "[a]ll persons are prohibited from importing into the United States from any foreign country . . . any lottery ticket . . ." and authorizes forfeiture proceedings with respect to such tickets. *See* 19 U.S.C. § 1305(a)-(b).

"The term 'United States' includes all Territories and possessions of the United States except the Virgin Islands, American Samoa, Wake Island, Midway Islands, Kingman Reef, Johnston Island, and the island of Guam." 19 U.S.C. § 1401(h). The territories included within the term "United States" are part of the United States customs territory. The excluded territories are not. *See United States v. Hyde*, 37 F.3d 116, 121 (3d Cir. 1994). As such, Puerto Rico is part of the United States customs territory, but the Virgin Islands is not.

The term "foreign country" is not defined as it appears in Section 1305(a).

The United States argues that shipping Puerto Rican lottery tickets from the United States Virgin Islands into Puerto Rico

constitutes importing lottery tickets into the United States from a foreign country, in violation of Section 1305(a). Indeed, at the March 13, 2018, hearing, the United States took the position that, under the Tariff Act, the Virgin Islands is a foreign country. *See March 13, 2018, Hearing*, ECF No. 19, at 9:25-10:7.

In support of its position, the United States directs the Court to the opinion of the United States Court of Appeals for the First Circuit in *Couvertier v. Gil Bonar*. 173 F.3d 450 (1st Cir. 1999). In that case, the First Circuit held that transporting Puerto Rican lottery tickets from the United States Virgin Islands into Puerto Rico violated Section 1305(a). *Id.* at 452. The First Circuit reasoned that:

> Although the term "foreign country" is not defined, the Act does provide a definition for "United States" at § 1401(h): "The term 'United States' includes all Territories and possessions of the United States *except the Virgin Islands,* American Samoa, Wake Island, Midway Islands, Kingman Reef, Johnston Island and the island of Guam." (emphasis added). A plain and proper reading of the statute supports the conclusion that the U.S.V.I. are deemed a "foreign country" for purposes of the Act.
>
> Moreover, as the district court discussed, this conclusion finds support in the history of the relationship between the United States and the U.S.V.I. The U.S.V.I. were acquired by the United States from Denmark in 1917. Particular provisions were enacted allowing Danish customs laws in effect at the time of the transfer to remain in

> full force and effect, thereby creating a separate customs territory. *See* 48 U.S.C. § 1395. This principle has been preserved with certain modifications. *See Paradise Motors, Inc. v. Murphy,* 892 F.Supp. 703 (D.Vi.1994) (detailing the history of the relationship between the United States and the U.S.V.I. with particular attention to the customs area). At present, articles coming into the United States from the U.S.V.I. are subject to duties and taxes similar to those imposed on merchandise coming in from foreign countries. *See* 48 U.S.C. § 1394.
>
> The purpose of § 1305 is to avoid the importation into the United States of various types of printed material including lottery tickets. Inasmuch as the U.S.V.I. have preserved their own customs territory, independent from United States customs control, allowing the entry of this material from the U.S.V.I. would circumvent the statute's goal.

*Id.*

This Court is not bound by decisions of the First Circuit, but those decisions may be persuasive. In this case, the Court is not persuaded that the First Circuit's interpretation of Section 1305(a) is correct. When interpreting a statute, the Court "start[s] . . . with the statutory text, and proceed[s] from the understanding that [u]nless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *Sebelius v. Cloer*, 569 U.S. 369, 376, 133 S. Ct. 1886, 1893, 185 L. Ed. 2d 1003 (2013). In addition, the Court generally "assume[s] . . . that every word in a statute has meaning and avoid[s] interpreting one part of a

statute in a manner that renders another part superfluous." *Disabled in Action of Pennsylvania v. Se. Pennsylvania Transp. Auth.*, 539 F.3d 199, 210 (3d Cir. 2008).

Section 1305(a) forbids an individual from "importing [certain goods] into the United States *from any foreign country*." 19 U.S.C. § 1305(a) (emphasis added). The text references two geographic categories: the United States and foreign countries. It does not necessarily follow that there are *only* two dichotomous geographic categories for customs purposes: the United States customs territory (which excludes the Virgin Islands) and foreign countries (of which the Virgin Islands would be regarded as part). If that were the case, then the phrase "from any foreign country," would be entirely superfluous as any good "import[ed] . . . *into* the United States" would necessarily be imported from a foreign country. *See id.* (emphasis added).

Congress has consistently rejected such a dichotomy in the customs laws. Indeed, Congress's rejection of such an approach is evident in several sections of the Tariff Act of 1930--the same act in which Congress initially passed Section 1305(a). *See* Act on June 17, 1930, 46 Stat. 590, 688, 744, 745. For example, in section 557 of that act--where the term "United States" was defined to exclude the Virgin Islands and certain other

territories[4] and the term "foreign country" was undefined--

Congress provided that:

> Merchandise upon which the duties have been paid and which shall have remained continuously in bonded warehouses or otherwise in the custody and under the control of customs officers, may be entered or withdrawn at any time within three years (or ten months in the case of grain) after the date of importation or exportation or for transportation and exportation to a foreign country, or for shipment or for transportation and shipment to the Virgin islands, American Samoa, or the island of Guam, under such regulations as the Secretary of Treasury shall prescribe, and upon such entry or withdrawal, and exportation or shipment, 99 per centum of the duties thereon shall be refunded.

Act on June 17, 1930, 46 Stat. 590, 744. That provision--as subsequently amended to track, among other things, the current definition of the term "United States"--is currently codified at 19 U.S.C. § 1557(a)(2). *See* 19 U.S.C. § 1557(a)(2) (providing for withdrawal of merchandise "within 5 years after the date of importation, or such longer period of time as the Bureau of Customs and Border Protection may at its discretion permit upon proper request being filed and good cause shown, for exportation or for transportation and exportation to a foreign country, or for shipment or for transportation and shipment to the Virgin

---

[4] The act defined the term "United States" to exclude the "Philippine Islands, the Virgin Islands, American Samoa, and the island of Guam." Act on June 17, 1930, 46 Stat. 590, 708.

Islands, American Samoa, Wake Island, Midway Islands, Kingman Reef, Johnston Island, or the island of Guam").

If Congress intended for the Virgin Islands to be treated like a foreign country, then the phrase "for exportation or for transportation and exportation to a foreign country" would encompass "for shipment or for transportation and shipment to the Virgin islands." Thus, shipment from the United States to the Virgin Islands cannot constitute exportation to a foreign country, without rendering a portion of the act superfluous. Because the term "import[]" and the term "export[] . . . have a necessary correlation," *see Woodruff v. Parham*, 75 U.S. 123, 131, 19 L. Ed. 382 (1868), it follows that shipment from the United States customs territory to the Virgin Islands does not constitute importation into the United States from a foreign country.[5]

In other tariff laws, Congress has also distinguished between United States territories outside the United States

---

[5] That act also indicates in several other sections that Congress did not intend the term "foreign country" to encompass United States territories outside the United States customs territory. In two sections of the Tariff Act of 1930, the term "foreign country" is expressly defined. *See* Act on June 17, 1930, 46 Stat. 590, 702, 706. While the definitions in those sections do not apply to Section 1305(a), it is noteworthy that when Congress defined the term "foreign country," it excluded the United States and its possessions without limitation. *See id.* ("For the purpose of this section . . . the term 'foreign country' means any empire, country, dominion, colony, or protectorate, or any subdivision or subdivisions thereof (other than the United States and its possessions).").

customs territory and foreign countries. For example, although the Harmonized Tariff Schedule of the United States (the "HTSUS") provides that goods imported from United States territories outside the United States customs territory are subject to duty like goods imported from foreign countries, those goods are taxed differently if they were manufactured in a United States territory and less than a certain amount of the goods' value is attributable to foreign materials. *See* General Note 3(a) to the 2018 HTSUS*, available at* https://hts.usitc.gov/current (emphasis added); *see also* 19 U.S.C. § 1202 ("The Harmonized Tariff Schedule of the United States, which replaced the Tariff Schedules of the United States, is not published in the Code. A current version of the Harmonized Tariff Schedule is maintained and published periodically by the United States International Trade Commission and is available on their website . . . ."). Specifically, the HTSUS provides that, in general, "goods imported from insular possessions of the United States which are outside the customs territory of the United States" may be imported duty-free into the United States customs territory if such goods:

> [(1) are] the growth or product of any such possession, or [(2) are] manufactured or produced in any such possession from materials the growth, product or manufacture of any such possession or of the customs territory of the United States, or

>    of both, . . . [and] *do not contain foreign materials* to the value of more than 70 percent of their total value (or more than 50 percent of their total value with respect to goods described in section 213(b) of the Caribbean Basin Economic Recovery Act) . . . .

General Note 3(a)(iv)(A) to the 2018 HTSUS (emphasis added).

Thus, the HTSUS recognizes at least three types of materials: (1) materials from a United States territory outside of the United States customs territory; (2) materials from the United States customs territory; and (3) foreign materials. Clearly, there would be no need to separately recognize materials from the Virgin Islands--and other United States territories outside the United States customs territory--if Congress intended to treat the Virgin Islands like a foreign country.

Relevant caselaw pre-dating the passage of 19 U.S.C. § 1305(a) also supports the conclusion that the Virgin Islands is not a foreign country. The Supreme Court first addressed whether a United States territory constituted a foreign country under the tariff laws in *De Lima v. Bidwell*. 182 U.S. 1, 21 S. Ct. 743, 45 L. Ed. 1041 (1901). In that case, the Supreme Court considered whether a tariff statute that provided that certain duties "shall be levied, collected, and paid upon all articles imported from foreign countries" applied to articles imported

from Puerto Rico. *Id.* at 180-181. The Supreme Court held that the statute did not apply. It reasoned, in pertinent part, that:

> Territory thus acquired can remain a foreign country under the tariff laws only upon one or two theories: Either that the word 'foreign' applies to such countries as were foreign at the time the statute was enacted, notwithstanding any subsequent change in their condition, or that they remain foreign under the tariff laws until Congress has formally embraced them within the customs union of the states. The first theory is obviously untenable . . . *[A] country ceases to be foreign the instant it becomes domestic.* So, too, if Congress saw fit to cede one of its newly acquired territories (even assuming that it had the right to do so) to a foreign power, there could be no doubt that from the day of such cession and the delivery of possession such territory would become a foreign country, and be reinstated as such under the tariff law. Certainly no act of Congress would be necessary in such case to declare that the laws of the United States had ceased to apply to it.
>
> *The theory that a country remains foreign with respect to the tariff laws until Congress has acted by embracing it within the customs union presupposes that a country may be domestic for one purpose and foreign for another.* It may undoubtedly become necessary, for the adequate administration of a domestic territory, to pass a special act providing the proper machinery and officers, as the President would have no authority, except under the war power, to administer it himself; but no act is necessary to make it domestic territory if once it has been ceded to the United States. We express no opinion as to whether Congress is bound to appropriate the money to pay for it. This has been much discussed by writers upon constitutional law, but it is not necessary to consider it in this case, as Congress made prompt appropriation of the money stipulated in the treaty. *This theory also presupposes that*

> *territory may be held indefinitely by the United States*; that it may be treated in every particular, except for tariff purposes, as domestic territory; that laws may be enacted and enforced by officers of the United States sent there for that purpose; that insurrections may be suppressed, wars carried on, revenues collected, taxes imposed; in short, that everything may be done which a government can do within its own boundaries, and yet that the territory may still remain a foreign country. That this state of things may continue for years, for a century even, but that until Congress enacts otherwise, it still remains a foreign country. To hold that this can be done as matter of law we deem to be pure judicial legislation*. We find no warrant for it in the Constitution or in the powers conferred upon this court.* It is true the nonaction of Congress may occasion a temporary inconvenience; but it does not follow that courts of justice are authorized to remedy it by inverting the ordinary meaning of words.

*Id.* at 197-98 (emphasis added). The Supreme Court subsequently reaffirmed, several times, that a United States territory is not a foreign country. *See, e.g., The Diamond Rings*, 183 U.S. 176, 22 S. Ct. 59, 46 L. Ed. 138 (1901) (reaching the same conclusion with respect to the Philippine Islands); *Faber v. United States*, 221 U.S. 649, 658, 31 S. Ct. 659, 659, 55 L. Ed. 897 (1911)(holding that a most favored nation clause in a treaty with Cuba did not require the United States to extend to Cuba a preferential duty rate that had been granted to the Philippine Islands).

There is no indication that Congress intended to depart from the established interpretation of the term "foreign country" when it passed Section 1305(a). Instead, as previously discussed, the statutory text reflects an intent to proceed in accordance with such precedent. Indeed, until the First Circuit decided *Couvertier*, courts interpreting the Tariff Act of 1930, as it has been amended over the years, have consistently held that United States territories are not foreign countries. *See, e.g., Mitsubishi Int'l Corp. v. United States*, 55 Cust. Ct. 319, 324 (Cust. Ct. 1965) ("It is clear that Guam is not in fact a foreign country but is an unincorporated territory of the United States. It is also clear that, for customs purposes, it is not always treated as a part of the 'United States,' as defined in tariff acts." (citations omitted)); *Dulien Steel Prod., Inc. v. United States*, 35 Cust. Ct. 339, 340 (Cust. Ct. 1955) ("We conclude that Guam is not a foreign country within the meaning of section 1 of the Tariff Act of 1930, as amended, supra, and that, at the time of the entry involved herein, importations therefrom were not subject to duty.").

As such, the Court holds that the term "foreign country," as it appears in Section 1305(a), was not intended to encompass any United States territories or possessions. Thus, where, as here, Puerto Rican lottery tickets are shipped between the

*United States v. Five Hundred and Forty Dollars ($540) in U.S. Currency, Representing 540 Puerto Rican Lottery Tickets*
Civ. No. 2016-18
Memorandum Opinion
Page 17

United States Virgin Islands and Puerto Rico, Section 1305(a) does not prohibit their entry or authorize their seizure.[6]

For the reasons stated above, the Court denied the motion of the United States for default judgment and ordered the United States to release the proceeds from the redeemed lottery tickets[7] to the individual who sought to mail the tickets.

                                                S\_____
                                                  **Curtis V. Gómez**
                                                  **District Judge**

---

[6] To be clear, the Court is not holding that a lottery ticket originating in a foreign country may be imported into the Virgin Islands and then imported from the Virgin Islands into Puerto Rico, without violating Section 1305(a). Although the Court need not reach that issue, the Court notes that such an importation would circumvent the intent of the statute. Indeed, in a related context, Congress has provided that products manufactured in foreign countries, and then imported into the United States customs territory through the United States Virgin Islands, are subject to duties. *See* General Note 3(a)(iv)(A) to the 2018 HTSUS; *see also Dulien Steel Prod., Inc. v. United States*, 35 Cust. Ct. 339, 341 (Cust. Ct. 1955) ("It is well settled that an article shipped from one country through another, without entering the commerce of the latter, is an importation from the former.").

[7] The Court finds it curious in light of certain explicit provisions of Section 1305 that the customs agents elected to convert the lottery tickets to cash, and thereafter seek forfeiture of the funds. Indeed, Section 1305(b)--which governs forfeiture of the items prohibited by Section 1305(a) --provides that "[u]pon . . . adjudication [by the district court]" that the goods "seized . . . [are] of the character the entry of which is by this section prohibited," the goods "shall be ordered destroyed and shall be destroyed." 19 U.S.C. § 1305(b). Even if the seizure in this matter were otherwise proper, Section 1305(b) does not appear to permit the United States to, as it has here, redeem the lottery tickets and seek forfeiture of the winnings.